# COURT OF APPEALS
# DECISION
# DATED AND FILED

## July 25, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP993**

Cir. Ct. No. **2007FA6117**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

---

IN RE THE MARRIAGE OF:

DEBORAH SCHWARTZ KRAVIT,

PETITIONER-RESPONDENT,

V.

WILLIAM MURRAY KRAVIT,

RESPONDENT-APPELLANT.

---

APPEAL from an order of the circuit court for Milwaukee County: CAROLINA STARK, Judge. *Affirmed*.

Before Brash, C.J., Donald, P.J., and Dugan, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.   William Murray Kravit (William) appeals an order of the circuit court denying his post-judgment motion to terminate or revise the prior maintenance order in this divorce action.  He argues that in rendering its decision the circuit court declined to consider as relevant to the statutory factors: (1) "evidence that showed the full financial picture of the parties in the years immediately leading up to the divorce or the lifestyle they lived during that time"; (2) "evidence related to the lifestyle [Deborah Schwartz Kravit (Deborah)] could have reasonably anticipated enjoying if she had remained married to [William]"; (3) Deborah's "current budget, actual reasonable budget or the full financial pictures of the parties following the divorce and at the time of the evidentiary hearing"; and (4) "[t]he court declined to do the traditional comparison of the financial circumstances, budgets, and needs at the time of divorce and at the time of the modification hearing and how those financial circumstances may have changed and whether [Deborah] could now be self-supporting."

¶2    We disagree, and we conclude that the circuit court reasonably exercised its discretion in rendering its decision modifying the maintenance order. Accordingly, we affirm.

**BACKGROUND**

¶3    Deborah and William were married on July 4, 1976, and Deborah filed a petition for divorce on October 10, 2007.  On October 26, 2009, the circuit court, the Honorable Francis Wasielewski presiding, orally granted a Judgment of Divorce, which adopted and incorporated as a part of the judgment the parties'

Marital Settlement Agreement (MSA).[1]  The approved MSA resolved all the divorce issues, and the trial court did not conduct a trial or hear any evidence on any of the divorce issues, including the maintenance from William to Deborah. During the divorce both parties were represented by counsel, both parties retained certified public accountants to assist them in negotiating the MSA, and the divorce was uncontested.

¶4      Regarding the issue of maintenance paid by William to Deborah, the relevant portion of the MSA and judgment of divorce states:

> B.      William shall pay Deborah maintenance according to the following formula:
>
> (a) William shall pay Deborah a base maintenance amount of $7,000 per month beginning January 1, 2010.
>
> (b) William shall pay Deborah 16.5% of annual gross commission revenues that exceed $1,667,000 as maintenance from gross revenues to a maximum of $280,000 of maintenance per year from all his insurance related business interests including but not limited to the following:
>
> 1.   FHK
>
> 3.   KHC
>
> 4.   Senior Benefit Service, Inc.[2]
>
> ….

---

[1] The court subsequently issued written Findings of Fact, Conclusions of Law, and Judgment of Divorce on December 3, 2009.  We refer to Judge Wasielewski as the trial court and the Honorable Carolina Stark who presided over the motion to modify maintenance as the circuit court.

[2] At the hearing on the motion regarding maintenance, the circuit court found that William no longer owned or operated KHC or Senior Benefit Service, Inc.

3

> E. The payments shall continue until further order of the court or either party's death or Deborah's remarriage.

Thus, Deborah was to receive maintenance between $84,000 and $280,000 per year under the MSA. In the years since the divorce, William's maintenance payments never fell below the $280,000 cap. Deborah mostly lived off her maintenance payments during that time.

¶5 On March 11, 2019, William filed a motion to modify maintenance, alleging that Deborah's financial situation had dramatically improved since the original divorce judgment and that maintenance was no longer needed or warranted under the law. In part, he asserted that Deborah had inherited a substantial sum of money from her parents. He further maintained that, in 2005, Deborah's parents created separate trusts for Deborah and her sister, Susan, that are governed under Florida law.[3] Deborah and Susan are co-trustee's of Deborah's trust (the trust), and Deborah and William's children are the remainder beneficiaries of the trust—they have no right to any benefits from the trust while Deborah is alive.

¶6 In relevant part, Section 5.06 of the trust provides that:

> a. During the life of such child, the independent Trustee may distribute to or for the benefit of such child, so much of the net income of the trust as the independent Trustee, in its sole and absolute discretion, shall deem appropriate.
>
> b. During the life of such child, upon the written request of such child, the Trustee shall pay to such child, or use on such child's behalf, so much of the principal of this

---

[3] We note that the circuit court erroneously stated in its findings of fact that both Deborah and Susan were beneficiaries of the same trust. In fact, Deborah and Susan are sole beneficiaries of separate trusts which contain the same language.

> trust as such child from time to time may request in writing; provided, however, that such withdrawals shall not exceed in the aggregate in any calendar year an amount equal to five (5) percent of the value of the principal of this trust, valued at the end of the calendar year. The Trustee shall pay this sum no later than thirty (30) days after the end of the calendar year within which the request is made.
>
> c. During the life of such child, the Trustee shall pay to or for the benefit of such child, upon such child's written demand, or, alternatively, the independent Trustee pay to or for the benefit of such child, in its sole and absolute discretion, so much of the principal of this trust as may be necessary for such child's maintenance, support and health.

The parties disputed what rights Deborah has to request sums from the trust without Susan's approval and what sums Deborah can request which Susan would have the discretion to grant or deny.

¶7 On March 15 and 16, 2021, the circuit court held a hearing on the motion to modify maintenance. William, Deborah, William's CPA, and attorney Philip Halley[4] testified. The circuit court concluded that a substantial change in circumstances occurred—that change was that in 2012 Deborah became the beneficiary of the trust created by her parents. It found that as of January 31, 2021, the trust had a value of $1,000,786.35. It also found that the terms of the trust prohibited Deborah from making decisions about her own demands for disbursements from the trust.

¶8 Regarding disbursements to Deborah under the terms of the trust, the circuit court found that "Deborah has a right, she is entitled, to receive on an annual basis five percent of the value of the trust. She simply has to request this.

---

[4] Deborah called Halley as an expert regarding the terms of the trust.

… [I]t does not require the approval of any trustee." The court then found that in addition to the 5%, Deborah could "demand or request that additional principal distributions be made to her as necessary for her maintenance, support and/or health." It then found that if she made such a request, the co-trustee, Susan, would have to make a decision under the terms of the trust whether or not to grant that request. It further explained that in doing so, "Susan would have to use her discretion … in good faith with the terms of the trust and under her fiduciary duty to all of the trust beneficiaries."

¶9      The court went on to explain that it had to focus on whether any substantial change in circumstance occurred since the judgment of divorce, and if so, does that change warrant a modification to the maintenance order to accomplish two objectives—(1) to provide sufficient support to Deborah, and (2) to achieve fairness for both parties. The court then stated that the best evidence about what Deborah could reasonably expect her standard of living to be at the time they divorced, had they remained married, was the MSA "that they agreed to with legal representation and advice from CPAs and that [the trial court] approved."[5]

¶10      The court then addressed whether that change warranted a modification of the maintenance order. It first addressed the support objective of maintenance. It noted that since the divorce, Deborah had become the beneficiary of her parents' trust. It found that based on the value of the trust on January 31, 2021, Deborah was entitled to request and receive a distribution of $89,339.31 per year. It then concluded that because Deborah had that asset "available to her for

---

[5] Further detail of the circuit court's reasoning is provided below.

support reduces her need for maintenance from William to obtain the support objective."

¶11    The circuit court then addressed the fairness objective of maintenance.  It stated that at the time of the divorce, fairness required a maintenance payment of $7,000 per month and the 16.5% of the gross commission revenues that exceeded $1,666,000 to a maximum maintenance per year capped at $280,000.  It explained that the best evidence of that being fair is the terms of the MSA that the parties reached with the help of attorneys and CPAs, and that the trial court approved.  The circuit court further stated that the "new asset [the trust] that [Deborah] has available for her support makes the terms of maintenance as outlined in the [MSA] … no longer fair to both parties[.]"

¶12    The circuit court then concluded that the substantial change in circumstances warranted modifications to the maintenance order "to achieve the support objective and the fairness objective."  It ordered that William's base maintenance payment be reduced to $0 per month and that the 16.5% of annual gross revenues that exceed $1,666,000 to a maximum maintenance per year be reduced from $280,000 to $190,669.69.[6]

¶13    William now appeals.

## DISCUSSION

¶14    On appeal, William argues that in rendering its decision the circuit court declined to consider as relevant to the statutory factors:  (1) "evidence that

---

[6] The circuit court subtracted the $89,339 that Deborah was entitled to receive from the trust from the $280,000 to come to this amount.

showed the full financial picture of the parties in the years immediately leading up to the divorce or the lifestyle they lived during that time"; (2) "evidence related to the lifestyle [Deborah] could have reasonably anticipated enjoying if she had remained married to [William]"; (3) Deborah's "current budget, actual reasonable budget or the full financial pictures of the parties following the divorce and at the time of the evidentiary hearing"; and (4) "[t]he court declined to do the traditional comparison of the financial circumstances, budgets, and needs at the time of divorce and at the time of the modification hearing and how those financial circumstances may have changed and whether [Deborah] could now be self-supporting."

¶15 We disagree, and we conclude that the circuit court reasonably exercised its discretion in rendering its decision modifying the maintenance order.

## I. Applicable Law

¶16 "The determination of the amount and duration of maintenance is entrusted to the sound discretion of the circuit court, and this court will not disturb the determination of the circuit court unless the circuit court abuses its discretion."[7] *LaRocque v. LaRocque*, 139 Wis. 2d 23, 27, 406 N.W.2d 736 (1987). However, "[t]he exercise of discretion is not the equivalent of unfettered decision-making…. [A] discretionary determination must be the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and

---

[7] Our supreme court has previously directed that the term "abuse of discretion" be replaced with "erroneous exercise" of discretion. *See City of Brookfield v. Milwaukee Metro. Sewerage Dist.*, 171 Wis. 2d 400, 423, 491 N.W.2d 484 (1992).

reasonable determination." *Id.* (alterations in original; citations omitted). "A circuit court engages in an erroneous exercise of discretion when it fails to consider relevant factors, bases its award on factual errors, makes an error of law, or grants an excessive or inadequate award." ***Rohde-Giovanni v. Baumgart***, 2004 WI 27, ¶18, 269 Wis. 2d 598, 676 N.W.2d 452.

¶17    A circuit court determining a maintenance award and an appellate court reviewing a maintenance award must begin with WIS. STAT. § 767.56(1c) (2021-22).[8] *See **LaRocque***, 139 Wis. 2d. at 31. The statute provides that the court may grant an order requiring maintenance payments to either party for a limited or indefinite length of time after considering all of the factors listed in the statute which include:

> **(a)** The length of the marriage.
>
> **(b)** The age and physical and emotional health of the parties.
>
> **(c)** The division of property made under s. 767.61.
>
> **(d)** The educational level of each party at the time of marriage and at the time the action is commenced.
>
> **(e)** The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, custodial responsibilities for children and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
>
> **(f)** The feasibility that the party seeking maintenance can become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and, if so, the length of time necessary to achieve this goal.

---

[8] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted. However, we note that the *LaRocque* court cited to the 1985-86 version of the statutes.

**(g)** The tax consequences to each party.

**(h)** Any mutual agreement made by the parties before or during the marriage, according to the terms of which one party has made financial or service contributions to the other with the expectation of reciprocation or other compensation in the future, if the repayment has not been made, or any mutual agreement made by the parties before or during the marriage concerning any arrangement for the financial support of the parties.

**(i)** The contribution by one party to the education, training or increased earning power of the other.

**(j)** Such other factors as the court may in each individual case determine to be relevant.

Sec. 767.56(1c). "These factors are the touchstone of analysis in determining or reviewing a maintenance award. They reflect and are designed to further two distinct but related objectives in the award of maintenance[.]" *LaRocque*, 139 Wis. 2d. at 32-33. Those objectives are "to support the recipient spouse in accordance with the needs and earning capacities of the parties (the support objective) and to ensure a fair and equitable financial arrangement between the parties in each individual case (the fairness objective)." *Id.* at 33.

¶18 Moreover, as our supreme court explained in *Rohde-Giovanni*:

While a change in circumstances regarding the support objective of maintenance frequently gives rise to parties' motions for modification, it is important to note that a court reviewing a previous award of maintenance must not solely limit its inquiry to the support objective. The objective of fairness also must be considered, even in postdivorce proceedings. Fairness must be considered with respect to the situations of both parties in determining whether maintenance should be continued indefinitely, continued for a limited amount of time, reduced, or terminated.

*Rohde-Giovanni*, 269 Wis. 2d 598, ¶31. Further, in *LaRocque*, our supreme court stated that "[w]e believe that a reasonable maintenance award is measured not by

the average annual earnings over the duration of a long marriage but by the lifestyle that the parties enjoyed in the years immediately before the divorce *and could anticipate enjoying if they were to stay married*." *LaRocque*, 139 Wis. 2d. at 36 (emphasis added). In a subsequent case, the court went on to say that "[w]hile a court may base maintenance on an increase in the payer's income which occurs in the years immediately preceding the divorce, a court may also set a flexible percentage award which will take into account any post-divorce increases which the parties could reasonably anticipate." *Hefty v. Hefty*, 172 Wis. 2d 124, 134, 493 N.W.2d 33 (1992).

### I.   William forfeited his argument regarding the terms of the trust

¶19    We first address whether William forfeited his argument regarding the terms of the trust. William points out that the circuit court held that disbursements from the trust to which Deborah had a "right" or "entitlement" by mere written request and that did not need approval or an exercise of discretion of the co-trustee, Susan, should be allocated to Deborah's support needs in lieu of William paying maintenance in that amount. By contrast, if the disbursements required Susan's approval or exercise of discretion then those disbursements should not be allocated to Deborah's support needs in lieu of William paying maintenance in that amount.

¶20    William then states that he does not appeal or object to the court's use of that standard. He believes that it is a reasonable exercise of discretion for the court to distinguish between disbursements that Deborah can exclusively control and those that require Susan's approval. He then states that he appeals the amount and types of disbursements that were allocated because the circuit court's

11

application of this standard and its calculations are based upon errors that materially alter and limit the reduction of William's maintenance.

¶21    Deborah argues that William did not make this argument before the circuit court and raises it for the first time on appeal and, therefore, forfeited the argument. "When a party does not raise an issue in the trial court, the party loses the right to raise that issue on appeal." *Cashin v. Cashin*, 2004 WI App 92, ¶26, 273 Wis. 2d 754, 681 N.W.2d 255. The *Cashin* court then stated that the court has discretion to decide an issue that has been forfeited and further stated, "We generally do not do so when the issue involves questions of fact not brought to the attention of the trial court, or an error that could have corrected had it been brought to the trial court's attention." *Id.* (citations omitted).

¶22    We have searched the record and find no indication that William raised this argument in the circuit court. However, it is clear from the record that Section 5.06c. of the trust was an issue that William knew that the court would be considering. Halley's testimony and his report, admitted into evidence, stated that Deborah did not have absolute control over any level of disbursement of principal that she may need for her maintenance, support and health under Section 5.06c. Rather, the person making the determination of what is necessary for Deborah's "maintenance, support and health" is the trustee. Moreover, under Section 8.06 of the trust:

> no individual Trustee who is also a current beneficiary of a trust hereunder shall participate in exercising any discretion as to whether or to what extent principal or income shall be distributed or applied to or for his or her own benefit …. All said powers shall be exercisable by the other Trustee serving hereunder[.]"

(Emphasis omitted).

¶23    Additionally, during the trial on the motion, William's counsel cross-examined Halley about Section 5.6.a. and b., but did not question him about Section 5.06c. at all.    Further, at the conclusion of the trial, the circuit court directed counsel to submit their closing arguments in writing.    In her closing argument brief, William's counsel told the court that Halley testified that Deborah has a right on an annual basis to withdraw 5% of the value of the trust each year. She then states that "[f]or anymore, [Deborah] merely needs the permission of her sister to whom [sic] she is extremely close."    Rather than argue that Deborah has an absolute right "to any amount of principal necessary for her maintenance, support and health," counsel conceded that Susan, as trustee, had to exercise her discretion in granting or denying a request by Deborah for funds under Section 5.06c. of the trust.    This is contrary to William's argument on appeal.

¶24    "The party who raises an issue on appeal bears the burden of showing that the issue was raised before the circuit court."    *State v. Huebner*, 2000 WI 59, ¶10, 235 Wis. 2d 486, 611 N.W.2d 727.    This rule is "not merely a technicality or a rule of convenience; it is an essential principle of the orderly administration of justice."    *Id*.    "The rule promotes both efficiency and fairness, and 'go[es] to the heart of the common law tradition and the adversary system.'" *Id*. (quoting *State v. Caban*, 210 Wis. 2d 597, 604-05, 563 N.W.2d 501 (1997)). Because William's specific argument was not preserved, we see no compelling reason to take up this issue now when William had ample opportunity to raise it in the circuit court.

¶25 Thus, we conclude that William forfeited his argument regarding disbursements under Section 5.06c of the trust because he did not raise the issue before the circuit court.[9]

## II. The Circuit Court properly analyzed the "Support Objective" and the "Fairness Objective"

¶26 We next address whether the circuit court properly analyzed the support objective and the fairness objective in determining whether the maintenance order needed to be modified.[10]

---

[9] Moreover we conclude that William conceded Deborah's argument that he forfeited his argument regarding payment under Section 5.06c because he did not mention, let alone refute, Deborah's argument in his reply brief. *See **United Coop. v. Frontier FS Coop.**, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (holding that an appellant's failure to dispute respondent's arguments in a reply brief may be taken as a concession).

Although we conclude that William forfeited his argument and conceded Deborah's forfeiture argument, we note that we agree with the circuit court's interpretation of the Section 5.06c. of the trust. That provision provides that the "Trustee shall pay to or for the benefit of such child … so much of the principal of this trust as may be necessary for such child's maintenance, support and health." The language requires that someone must determine if the request is "necessary." The only person who can make that determination is the trustee. Under the terms of the trust that person could not be Deborah. Section 8.06 provides in part "no individual Trustee who is also a current beneficiary of a trust hereunder shall participate in exercising any discretion as to whether or to what extent principal or income shall be distributed or applied to or for his or her own benefit … All said powers shall be exercisable by the other Trustee serving hereunder." As noted above, William's counsel acknowledged this in her closing argument brief. Moreover, Section 5.06c. provides that the aggregate annual distribution of the principal of the trust "shall not exceed" 5% of the value of the principal in a given year. William's argument that Deborah can demand at any time that an unlimited of principal be paid to her merely as a result of her demand would render the cap in Section 5.06b superfluous. Thus we agree with the circuit court's interpretation of the trust.

[10] The parties do not dispute that the circuit court properly concluded that Deborah's inheritance under the trust constituted a substantial change in circumstances. Thus, we will not discuss the issue further.

*THE PARTIES' ARGUMENTS*

¶27   William argues that "the circuit court erroneously exercised its discretion when it failed to consider relevant factors and evidence, created its own finding of fact in the judgment of divorce, and did not adequately explain how certain factual findings made met the dual objectives of a maintenance award." He asserts that the circuit court created "a sort of shortcut" to meet the *LaRocque* standard.[11]   He states that the circuit court found that the maintenance portion of the MSA provided the best evidence about what Deborah could reasonably, at the time of divorce, expect as a standard of living had the parties remained married and what she could reasonably expect as her standard of living at the time of the trial.   He notes that the court also stated that at the time of the trial, Deborah's "standard of living was equal to the standard of living that she reasonably could have expected at the time of divorce had the parties remained married."

¶28   William then argues that the court's exercise of discretion was erroneous because the trial court never made that finding, and due to the circuit court's shortcut, no court ever conducted the requisite analysis under the statutory factors and dual objectives to make that finding.   He then argues that the circuit court failed to apply or misapplied the statutory factors to the proper legal standard and, therefore, erroneously exercised its discretion.

---

[11] William states that the *LaRocque* court stated that rather than considering the average income earned over the years of the marriage, the circuit court should look at the "lifestyle that the parties enjoyed in the years immediately before the divorce and could anticipate enjoying if they were to stay married."  *See LaRocque v. LaRocque*, 139 Wis. 2d 23, 36, 406 N.W.2d 736 (1987).   He states that the *Larocque* court further stated that in considering whether a maintenance award meets that goal, the circuit court determining or reviewing a maintenance award needs to consider the statutory factors under WIS. STAT. § 767.56(1c), and apply the relevant ones while considering the dual objectives of need/support and fairness.

¶29     Deborah agrees that the circuit court properly exercised its discretion when it determined that her inheritance through the trust reduced her need for maintenance from William and modified the maintenance order by eliminating the $7,000 base monthly maintenance payments under the support objective. However, she argues that the court did not erroneously exercise its discretion in maintaining the maintenance formula from the gross revenues of William's insurance business because that is appropriate under the fairness objective. She asserts that the percentage maintenance provision reflects the parties understanding in 2009 of how William's business fortunes could affect their standard of living.

¶30     Deborah further argues that the circuit court recognized that by including a provision for base maintenance and additional maintenance on a percentage of William's business income, in other words the negotiated MSA reflected what the parties could reasonably expect their standard of living to be if they stayed married. She asserts that their standard of living was tied to William's insurance business—if the insurance business did well and the parties were still married, both Deborah and William could reasonably expect their standard of living to increase. She asserts that her willingness to accept a provision in the MSA tying her maintenance to the business' success reflects her belief that the company would do well and she could reasonably expect a lifestyle based on the company's success had they stayed married. She asserts that the maintenance provision is itself, as the circuit court found, the best evidence of the standard of living that Deborah could anticipate if they stayed married. Deborah argues that she and William's reasonable expectations were set forth in the maintenance provision that anticipated that William's business would earn gross revenues that exceeded $1.7 million per year. The fact that the provision capped maintenance

reflects that they believed that the revenues could far exceed that amount. Deborah further asserts that her need for support was reflected in the base maintenance payment and the fairness objective was reflected in the percentage payment.

*THE CIRCUIT COURT'S DECISION*

¶31    We next address how the circuit court reached its conclusions.  The circuit court orally made findings of fact.  After discussing the MSA and its maintenance provisions, the court discussed the fact of Deborah's inheritance under the trust.  It found that under the trust Deborah was entitled to receive on an annual basis 5% of the value of the trust without needing anyone else's approval. It found that Deborah had not requested that she receive any disbursements from the trust—she wanted to let the value of the trust continue to grow for both her benefit and the benefit of her children as future beneficiaries upon her death.[12] She found that as of January 31, 2021, the value of the trust was $1,000,786.35.

¶32    The court then made findings regarding William and Deborah's ages and health at the time of the trial.[13]  It found that William was better situated financially than he was at the time of the divorce—he still owned his insurance related business and was self-employed in the business.  It found that William had the ability to pay the maintenance amount ordered in the divorce judgment and that he did not dispute his ability to make those payments.  The court also found

---

[12] As noted above, these children are also William's children.

[13] William was sixty-seven years old and was in general good health, with some health issues that were managed and did not interfere with his ability to work or take care of himself. Deborah was sixty-six years old and was in general good health, with some health issues that were managed and did not interfere with her ability to work or take care of herself.

17

that at the time of the trial, William's standard of living was at least equal to, if not better, than the standard of living that he reasonably could have expected at the time of the divorce had the parties remained married.

¶33    The circuit court then found that Deborah was better situated financially than she was at the time of the divorce, in great part due to her inheritance in the trust. Her standard of living was equal to the standard of living that she reasonably could have expected at the time of the divorce had the parties remained married. The court found that Deborah continued to have the ability to earn and contribute to her own support through work and wages, whether that was through choosing to draw from her pension, retirement accounts and other assets.

¶34    The circuit court then stated that it wanted to make a note about the fact findings that it was not making. It noted that the parties presented evidence about the parties' circumstances during the marriage, their level of education when they were married and whether it changed during the marriage, their earnings at the time that they were married and how that changed over the course of the marriage and some other things.[14] It stated that it made that decision because the court was not relitigating the initial divorce case or judgment. It explained that it had to focus on whether there was a substantial change in circumstances since the divorce was granted and the trial. It stated that if there was a substantial change in circumstances it had to determine whether the change warranted a modification of

---

[14] The court went on to say that it was not forgetting about that evidence, but rather made a conscious and mindful decision that it was not necessary for the court to make fact findings more than what it did about the parties' financial or other circumstances during the marriage or while the divorce was pending or about why they agreed to the terms of the MSA. It noted that the parties presented some evidence to the court about the parties' assets and debts at the time of the divorce and how those were divided under the MSA.

the maintenance order to accomplish the two maintenance objectives—to provide sufficient support to Deborah and to achieve fairness for both parties. The court then found that the best evidence of what Deborah could reasonably anticipate, at the time of the divorce, and her standard of living if they remained married, was the MSA which the parties agreed to with their counsel, the advice from their CPA's and that the trial court approved.

¶35     The circuit court then addressed the issue of whether there was a substantial change in circumstances since the divorce was granted and explained its reasoning for its conclusion.[15] The court then addressed whether the substantial change in circumstances warranted a modification of the maintenance order. It explained that it had to consider the dual maintenance objectives—the support objective and the fairness objective.

*THE SUPPORT OBJECTIVE*

¶36     The court first considered the support objective. It noted that at the time of the divorce the parties agreed that for Deborah to enjoy the standard of living that she could have reasonably expected at that time had the parties remained married, she needed $7,000 per month from William and an additional 16.5% of the annual gross commission revenues that exceeded $1,667,000 from his insurance business to a maximum of $280,000.[16]

---

[15] On appeal, the parties do not contest the court's conclusion.

[16] In her brief, Deborah states that her need for support was reflected in the base maintenance and that the fairness objective is reflected in the percentage payment based on the gross revenues of William's insurance business.

¶37 The circuit court then stated that since the divorce Deborah became the beneficiary of the trust under which she was entitled to receive a disbursement from the trust annually in the amount of 5% of the value of the trust—at that time in the amount of $89,339.31. It stated that the trust was an asset that was not available to Deborah at the time of the divorce. The court then found that having that "asset available to her for support reduces her need for maintenance from William to obtain the support objective." The court ordered that the maintenance order was modified to reflect that "William shall pay Deborah a base maintenance amount of zero dollars per month[.]"[17]

¶38 Deborah does not assert that the circuit court erred in reducing the base maintenance per month to zero based on the distribution she could receive from the trust. Thus, we need not consider the circuit court's decision to reduce the base maintenance further.

*THE FAIRNESS OBJECTIVE*

¶39 Addressing the fairness objective, the circuit court stated that fairness required that "under all of the circumstances, at the time of the divorce … fairness required a maintenance payment of $7,000 … [a]nd then the additional 16.5[%] of the annual gross commission revenues that exceeded [$1,667,000] to a maximum of $280,000 a year in maintenance[.]"[18] It then stated that Deborah could receive 5% of the value of the trust annually and that the new asset, the trust,

---

[17] We note that William does not argue that the circuit court erroneously exercised its discretion in modifying the base maintenance award by reducing it to $0.

[18] The court stated that the best evidence of its conclusion regarding fairness was the terms of the MSA that the parties reached with their counsel, with the CPAs, and that the trial court approved.

"makes the terms of maintenance as outlined in the marital settlement agreement that was made part of the divorce judgment no longer fair to both parties."

¶40    The circuit court then ordered that the maintenance order was modified to reflect that "[William] shall pay [Deborah] 16.5% of annual gross commission revenues that exceed $1,667,000 as maintenance from gross revenues to a maximum $190,660.69 of maintenance per year[.]"

### THE COURT DID NOT ERRONEOUSLY EXERCISE ITS DISCRETION

¶41    We agree with Deborah that the circuit court did not erroneously exercise its discretion in modifying the maintenance order.  The circuit court properly considered the two distinct but related objectives in the award of maintenance—the support objective and the fairness objective.  *See LaRocque*, 139 Wis. 2d at 33.

¶42    The circuit court focused its decision on the fairness objective.  As explained in *LaRocque*, the fairness objective is "to ensure a fair and equitable financial arrangement between the parties in each individual case[.]"  *Id.*  The *LaRocque* court further explained that "a reasonable maintenance award is measured not by the average annual earnings over the duration of a long marriage but by the lifestyle that the parties enjoyed in the years immediately before the divorce and *could anticipate enjoying if they were to stay married*."  *Id.* at 36 (emphasis added).  "Thus, the recipient spouse is entitled, assuming that the payor spouse's income permits it, to enjoy his or her life at the standard that he or she 'could *anticipate* enjoying' but for the divorce."  *Heppner v. Heppner*, 2009 WI App 90, ¶10, 319 Wis. 2d 237, 768 N.W.2d 261 (quoting *See Hefty*, 172 Wis. 2d at 134).

21

¶43 Consistent with these cases, throughout its decision in discussing the fairness objective, the circuit court referred to what standard of living Deborah could reasonably anticipate, at the time of the divorce, as her standard of living had the parties remained married. It considered how it should determine the standard of living that Deborah could reasonably anticipate as her standard of living had the parties remained married. It concluded that the best evidence of what standard she could reasonably anticipate was the maintenance provision in the MSA that the parties agreed to and which was incorporated into the divorce judgment.

¶44 William argues that the trial court never made such a finding at the time of the divorce—that the circuit court created its own finding of fact in the judgment of divorce. However, we note that the record reflects that although the trial court did not use those magic words, it did make that finding. During the hearing on October 26, 2009, the trial court stated:

> I am further satisfied that the parties have disclosed fully to each other their asset[s], debts, amounts and sources of income on their respective financial declarations and that the agreement they have made premised on those disclosures is fair and reasonable in the circumstances.
>
> This is a long-term marriage.… [T]hese parties have been married since 1976, a term of some 33 years. There is a disparity in earnings between the parties. William has an insurance business. Deborah has been also employed outside of the home with the Center for Deaf and Hard of Hearing. The difference between incomes of these parties is substantial. There is a program of indefinite maintenance provided in the agreement for maintenance for an indefinite term.… This appears to be reasonable to the Court. I am going to approve the provisions that the parties have made.
>
> I see from the mark ups on the copy of the [MSA] in the court file this has been the subject of considerable negotiation between the parties. As I said earlier … you know your own lives better than I do....

22

> I think what you have done with regard to maintenance, given the respective circumstances of these parties, is reasonable. It has the approval of the Court. It is tied to some future events; how well William's business does. It is subject to annual recompilations. If projections prove to be incorrect, then there can be adjustments made. I think that is a reasonable approach here. The property has been divided and likewise debt. This is a series of compromises that the parties have made in order to arrive at an agreement. Again, you made these with the assistance and advice of counsel.
>
> There was some testimony that there was accounting advice, which I think is prudent considering that there are also tax consequences attendant an event like this. I am going to respect those the decisions also, so that this agreement in its entirety will be approved by the Court and will become part of the judgment of divorce.

Clearly, the trial court's discussion regarding the fact that maintenance "is tied to some future events; how well William's business does" reflects that the court was considering what Deborah and William reasonably anticipated would be their standard of living in the future if they had stayed married. This is appropriate when the court is considering the fairness objective.

¶45     We conclude that the circuit court did not err in finding that those same factors that the trial court considered regarding Deborah and William's anticipated standard of living were also applicable at the trial on the motion to modify the maintenance order. According to our supreme court's decision in *Larocque*, it is proper to consider the lifestyle that the parties "could anticipate enjoying if they were to stay married." *Larocque*, 139 Wis. 2d at 36. Moreover, as our supreme court stated in *Hefty*, 172 Wis. 2d at 135, "[s]ince maintenance recipients are forced to adjust their own lifestyle downward when a payer's income decrease, the recipients may be allowed to share in an increase in a payer's income." The *Hefty* court went on to note that the payor pointed out that the maintenance award in that case exceeded the recipient's budget. *Id.* The court

stated that although the payor was correct, support is not the sole objective of maintenance. *Id.* It explained that "[m]aintenance furthers two distinct objectives: 'to support the recipient spouse in accordance with the needs and earning capacities of the parties (the support objective) and to ensure a fair and equitable financial agreement between the parties in each individual case (the fairness objective).'" *Id.* (citation omitted).

¶46 Here, the circuit court concluded that at the time of the divorce, Deborah reasonably anticipated that her standard of lifestyle, if she stayed married to William, was dependent on how well his insurance business did. That expectation was reflected in the trial court's comment that the maintenance in the MSA is tied to some future events—how well William's business does. Clearly, both Deborah and William understood that their lifestyle if they stayed married was tied to William's business. As William acknowledges, under the MSA, Deborah could receive maintenance between $84,000 and $280,000, depending on how well his business did. We also note that the maintenance provision provides that William shall pay maintenance to Deborah based upon the formula "from all his insurance related business interests." Thus, if William sells his insurance related business interests, Deborah would no longer be entitled to any maintenance under the circuit court's modified maintenance order. This reflects that the provision is fair to both Deborah and William because once he is no longer receiving revenue from his insurance business, he will no longer be obligated to pay Deborah maintenance—she shares in the revenue, but only so long as William is also receiving it.

¶47 In comparison to the circuit court's focus on the fairness objective and what standard of living Deborah could have reasonably anticipated if they stayed married, William centers his arguments on what was Deborah's monthly

budget that was necessary to maintain the lifestyle she enjoyed during the marriage. He describes the circuit court's analysis as, "the court appears to find that the additional annual maintenance from the 'unique 16.5% formula of gross revenue payment' is necessary to meet the fairness objective and 'some sort of enhanced lifestyle above that, enjoyed during the marriage,'" that Deborah could have reasonably anticipated enjoying had the parties remained married. He also refers to the maintenance being above and beyond Deborah's reasonable budget "necessary to maintain the lifestyle enjoyed during the marriage." He describes that lifestyle during the marriage as living "beyond their means, creating a dire financial picture at the time of the divorce."

¶48     Unlike the circuit court, William does not address holdings in cases that discuss the standard of living the parties could anticipate enjoying if they stayed married—not only the lifestyle they experienced during the marriage before the divorce. By contrast, throughout its decision, the court stated it was considering what Deborah could have "reasonably expected as her standard of living had they remained married." During its decision, the court stated "what could [Deborah] have reasonably expected as her standard of living had they remained married and [William] continued to work with these insurance business interests and what he earned from them."

¶49     We conclude that the circuit court did not erroneously exercise its discretion when it determined that under the fairness objective of maintenance, Deborah reasonably anticipated that her standard of living would substantially improve if William's insurance business did well and that the maintenance formula in the MSA would provide for that expectation. In *Hefty*, our supreme court stated that "it is proper to consider the lifestyle that the parties could *anticipate* enjoying if they stayed married." *Hefty*, 172 Wis. 2d at 134. It also

25

stated that a court "may also set a flexible percentage award which will take into account any post-divorce increases which the parties could reasonably anticipate." *Id.*[19]

¶50      Here, the record reflects that both the trial court and the circuit court took into consideration the fact that the parties reasonably anticipated marked fluctuations in William's income. The maintenance provision in the MSA not only included a provision granting Deborah a percentage of William's insurance business' gross revenues, but also set a cap on the amount she could receive— $280,000. Moreover, Deborah is not entitled to any additional maintenance until the gross revenues exceeded $1,667,000. We conclude that both the dollar amount that triggers Deborah being able to begin receiving additional maintenance under the formula and the cap show that the parties anticipated that their lifestyles would improve.[20]

---

[19] The circuit court had awarded Jean Hefty maintenance for an indefinite period of time in the amount of $5,000 per month plus 20% of any bonus Thomas Hefty may receive in excess of his base salary and child support in the amount of $1,500 dollars per month plus 10% of any bonus which he receives in excess of his base salary. *Hefty v. Hefty*, 172 Wis. 2d 124, 128, 493 N.W.2d 33 (1992).

The court explained that its holding only addressed "those situations where the parties could have reasonably anticipated marked fluctuations in income." *Id.* at 135.

[20] William asserts that during the marriage, Deborah and William lived a relatively upper middle-class lifestyle, but to do so, they basically lived beyond their means, creating a dire financial picture at the time of the divorce. We agree with Deborah's argument that if they truly believed that their circumstances were so dire and grim that they were on a downward trajectory that would result in a low standard of living why would they include a maintenance provision not only granting Deborah a percentage of FHK's gross revenues, but also capping the maximum maintenance that she could receive.

## CONCLUSION

¶51     We conclude that William forfeited his argument that under Section 5.06c of the trust Deborah was entitled to receive additional distributions from the trust in addition to the 5% distributions of principal under Section 5.06b because he did not raise that argument before the circuit court.  William also conceded Deborah's argument that he forfeited that argument because he did not raise it before the circuit court because he did not refute her argument in his reply brief.

¶52     We also conclude that the circuit court did not erroneously exercise its discretion in modifying the maintenance order and denying William's motion to terminate maintenance.  Its order addressed the support objective by removing the requirement that William pay Deborah a base maintenance of $7,000 per month and the fairness objective by reducing the cap on the formula maintenance from $280,000 to $ 190,000.69.

*By the Court.*—Order affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.

27